******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# LORRAINE ESPOSITO *v.* DANIEL U. RABIN ET AL.
## (AC 47934)

Alvord, Seeley and Keller, Js.

*Syllabus*

The plaintiff property owner appealed from the trial court's judgment for the defendants on her complaint and on two counts of their counterclaim, rejecting her request, inter alia, to quiet title in her favor to a disputed portion of her property on which the defendants, owners of abutting property, had encroached and trespassed. The plaintiff claimed, inter alia, that the court, which declined to quiet title for either party, improperly found that the defendants had acquired by adverse possession the encroachments they had placed in portions of the disputed area and that the plaintiff had trespassed on that area. *Held*:

The trial court's failure to quiet title to the disputed portion of the plaintiff's property was contrary to law and could not stand, as the court was required pursuant to statute **(§ 47-31)** to make a full determination of the parties' rights to the disputed area by settling title thereto but, by its decision, allowed a cloud to remain on the plaintiff's undivested record title that negatively impacted its marketability.

The defendants failed to establish by clear and convincing evidence all of the necessary elements of their adverse possession claim, as they did not provide the trial court with a description of the entire disputed area of the plaintiff's property they claimed to have acquired or a property description of their encroachments; accordingly, the trial court, having found that the plaintiff had complied with the requirements of § 47-31 (b), the judgment as to that count of her complaint seeking to quiet title was reversed and the case was remanded with direction to quiet title in her favor.

The trial court improperly rejected the plaintiff's claims that the defendants' encroachments on her property constituted a trespass for which she was entitled to injunctive relief, as the defendants intentionally continued to use the disputed area of the property for their encroachments after they learned that they did not own the disputed area.

The trial court improperly found that the plaintiff had trespassed on the defendants' encroachments in the disputed area of the property, as the plaintiff could not, as a matter of law or fact, trespass on property of which she had established record ownership.

The trial court's finding that security cameras on the plaintiff's property that were directed at the defendants' property constituted a nuisance was clearly erroneous, as the court engaged in no analysis and made no findings that supported its conclusion, it did not consider any relevant factors to determine if the use of the security cameras was unreasonable under the circumstances and there was no evidence regarding the alleged interference.

Argued January 13—officially released June 16, 2026

*Procedural History*

Action, inter alia, to quiet title to certain of the plaintiff's real property, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the defendants filed a counterclaim; thereafter, the case was tried to the court, *Stewart, J.*; judgment in part for the defendants, from which the plaintiff appealed to this court. *Reversed in part*; *judgment directed*; *further proceedings*.

*Jason A. Buchsbaum*, with whom, on the brief, was *Jill Vergara*, for the appellant (plaintiff).

*Timothy J. Lee*, for the appellees (defendants).

*Opinion*

KELLER, J. The plaintiff, Lorraine Esposito, appeals from the judgment of the trial court, rendered after a trial to the court, in favor of the defendants, Daniel U. Rabin (Daniel), and his wife, Gritli K. Rabin (Gritli), as to the plaintiff's three count complaint, and as to two of the defendants' three counterclaims. In this appeal, which arises out of a dispute between abutting property owners, the plaintiff claims that the court improperly **(1)** failed to settle title to a portion of her real property, as required by General Statutes § 47-31, despite the fact that she and the defendants had sought a determination of their respective rights therein, and that title to that disputed area should have been quieted in her favor, **(2)** determined that the defendants had proven their special defense of adverse possession as to encroachments they had placed on her property, **(3)** found that she had trespassed on the defendants' encroachments, **(4)** found that her use of security cameras and noisemakers on her property constituted a nuisance, **(5)** enjoined her from taking actions on her property, and **(6)** failed to find that the defendants had trespassed on her property, failed to enjoin them from continuing to do so and to award damages related to such trespass, and failed to order the defendants to remove their encroachments from,

and remediate any damages they may have caused to, her property. We reverse the court's judgment as to the plaintiff's complaint and with respect to counts two and three of the defendants' counterclaim.[1]

The following facts, as found by the trial court in its memorandum of decision or as undisputed in the record, and procedural history are relevant to our resolution of this appeal. The plaintiff owns and is in possession of real property at 71 Midwood Road in Branford (plaintiff's property), which she purchased in August 2021. The defendants own and are in possession of real property at 24 Stone Street in Branford (defendants' property), which Daniel purchased in 1985.[2] The two properties adjoin at the southeastern border of the plaintiff's property.

Shortly after the plaintiff purchased her property, she commissioned a survey of its boundary lines because she wanted to install fencing to contain her dog, Keno. This survey revealed that 80 percent of a shed owned by the defendants' and their entire fenced-in compost corral encroached on the plaintiff's property. The surveyor placed stakes along the boundary line that separated the plaintiff's property from the defendants' property. Then, on or about February 11, 2022, the plaintiff sent a letter to the defendants informing them about the encroachments but giving them "permission" to "'borrow'" the strip of land on which the encroachments had been placed. The plaintiff explained that this permission was "temporary and [she] reserve[d] the right to

[1]The trial court rendered judgment in favor of the plaintiff as to count one of the defendants' counterclaim, which sought a judgment quieting title in the defendants' favor as to an "encroached-upon portion" of the plaintiff's property. The defendants have not brought a cross appeal to challenge that judgment and, thus, have abandoned any claims they might have raised in this regard. See, e.g., *SMDV 1*, *LLC* v. *459-461 Pacific Street, LLC*, 233 Conn. App. 599, 606 n.4, 341 A.3d 304 ("[i]f an appellee wishes to change the judgment in any way, the party must file a cross appeal" (internal quotation marks omitted)), cert. denied, 353 Conn. 919, 345 A.3d 808 (2025).

[2]Daniel quitclaimed an interest in the property to Gritli in 1996.

revoke permission at any time which would require [the defendants] to remove all encroachments immediately."

Daniel telephoned the plaintiff two days later and suggested that he purchase the encroached-on land from her, but the plaintiff declined. She testified at trial that she "was not yet a year into [her] mortgage and [she] felt that that might be difficult," and that she "hadn't yet explored the area in February of 2022 and thought [she] needed to know more about it before [she] could reasonably understand what [she] might or might not [want to] sell."

In December 2022, after finding additional debris and yard waste on her property while she was clearing out the area near the defendants' encroachments to make it safe for her dog, the plaintiff sent a text message to Daniel asking that he "not use the property that you're borrowing" for debris and yard waste. Daniel responded by text, confirming that "[w]e've been composting leaves in the vicinity of the rock but I'll move them to a different area not on your land." Shortly thereafter, the plaintiff and Daniel had an impromptu in-person conversation during which the plaintiff requested the defendants' help with clearing the debris, advised that it was time for her to install the fence along the property line and that the encroachments would need to be removed within a few weeks. Daniel denied responsibility for all but certain tree branches that had fallen in his yard and stated that Gritli would not like the fence because it would ruin her view from the deck.

On January 28, 2023, the plaintiff sent Daniel a text message explaining that, because she had cleared out some of the area adjacent to the property line and her dog had open access to that area, she needed to ensure the dog's safety by moving forward with the installation of the fence. As such, the plaintiff asked Daniel to "relocate your shed, compost station, and all other property currently located on my side of the property line fairly quickly, hopefully within a week or two." Daniel promptly

responded with a text message stating that "my lawyer sent you a letter regarding the property line."

The letter from the defendants' counsel, dated January 26, 2023, referenced "the encroachment on 71 Midwood Road" and stated that the defendants' "use of the property has been open, notorious adverse, and continuous for more than [fifteen] years. By law, ownership of this portion of the property has vested in [the defendants] by virtue of adverse possession." The letter further "oppose[d] any attempt to relocate the shed, compost [corral], and the portion of the property used and maintained by [the defendants]."

On January 28, 2023, after she received the letter, the plaintiff sent a text message to Daniel disputing the defendants' adverse possession claim and requesting that the defendants "immediately remove all personal property and . . . make all repairs to [her] property so as to return it to its original condition." She then proceeded to install temporary fencing along the property line, and, while doing so, the defendants came out of their home. Gritli came down from the deck and attempted to engage the plaintiff in a conversation, but the plaintiff refused. Daniel stayed on the deck, and the plaintiff claimed he was staring at her. After that encounter, the plaintiff sent another text message to Daniel to provide "immediate notice of no trespassing" and to confirm that she had "installed temporary fencing . . . on [her] property according to the survey stakes." She also withdrew the permission she had given the defendants to access and use of "any [part] of [her] property including the area into which [they had] been discarding waste."

The defendants' counsel telephoned the plaintiff on or about January 30, 2023. During their conversation, the plaintiff reiterated her opposition to the defendants' adverse possession claim and inquired about, and requested a copy of, the evidence the defendants had to support it. In response, the defendants' counsel sent the plaintiff a letter dated January 30, 2023, along with a copy of an April 22, 2015 survey map on which,

he stated, "[w]e have highlighted the disputed area." Specifically, two red lines were drawn from the existing property line that separated the properties. The red lines came to a point, well into the plaintiff's property, and formed a triangle using the existing property line as its base. The plaintiff testified at trial that this triangular area was approximately 2500 square feet.

In May 2023, the plaintiff commenced this action against the defendants. The plaintiff's three count complaint alleged that the "defendants . . . placed a shed, compost corral, drainpipe, debris and waste and buried wire, over and across the plaintiff's property, all of which encroach and trespass upon the plaintiff's property." In the first count of her complaint, the plaintiff stated a claim for trespass and sought compensatory and punitive damages and costs in relation thereto.

In the second count of her complaint, captioned "injunctive relief," the plaintiff alleged that the encroachments "have caused and continue to cause damage to the plaintiff and her property," and that, if they are not removed, she "will suffer irreparable injury, in that a continuation of the encroachment may in the future ripen into a prescriptive easement or result in the defendants acquiring title to the encroachment area by adverse possession." Thus, she sought "[a] temporary and permanent injunction enjoining the defendants from encroaching upon [her] property, an order to remove the encroachments and an order to repair the damage caused by the encroachments and restore the property to its prior condition . . . ."

Finally, in the third count of her complaint, captioned "quiet title," the plaintiff alleged that she "is the absolute owner and is in possession and control of the real property located at 71 Midwood Road," having "acquired her title by warranty deed," and that the defendants "claim an interest in [her] property or parts thereof which are adverse to" her title. As a result, she expressly sought "[a] judgment determining the rights [of] the parties in and to the land *and settling the title thereto* . . . ."[3]

---

[3] "A person who claims title by deed is claiming that [she] has good record title which entitles [her], in an action to quiet title, to a judgment

(Emphasis added.) The plaintiff attached as exhibits to her complaint (1) a legal description of her property at 71 Midwood Road, (2) a legal description of the defendants' property at 24 Stone Street and (3) a map detailing the encroachment.

On June 12, 2023, the defendants filed an answer to the plaintiff's complaint as well as a special defense and a three count counterclaim. In their special defense, the defendants alleged that "[t]he title to the property described by the plaintiff in her complaint has vested in the defendants by virtue of adverse possession." Likewise, in the first count of their counterclaim, the defendants sought to quiet title to the "encroached-upon portion" of the plaintiff's property, alleging that title to that portion of the plaintiff's property had vested in them by adverse possession.[4] In the second count of their counterclaim, the defendants stated a claim for trespass predicated on the plaintiff's alleged attempt to remove their personal property from and her interference with a garden located within the area of "the disputed property . . . ." In the third count of their counterclaim, the

of ownership." *DeVita* v. *Esposito*, 13 Conn. App. 101, 106, 535 A.2d 364 (1987), cert. denied, 207 Conn. 807, 540 A.2d 375 (1988).

[4] The defendants do not expressly reference "adverse possession" in the first count of their counterclaim. As support for their claim to title to the "encroached-upon portion" of the plaintiff's property, however, they set forth the essential elements of adverse possession; see, e.g., *Mulvey* v. *Palo*, 226 Conn. App. 495, 500, 319 A.3d 211, cert. denied, 350 Conn. 902, 322 A.3d 1059 (2024); and there is no dispute in this appeal as to the nature of their claim. Indeed, Daniel confirmed during his testimony at trial that, "as part of [the defendants'] counterclaim, [they are] claiming that [they] have acquired a portion of [the plaintiff's] property by adverse possession . . . ." "[A] person who claims title by adverse possession is claiming that although he does not have record title, his proof of possession which is adverse, open, notorious and continuous for the entire statutory period entitles him, in an action to quiet title, to a judgment of ownership." *DeVita* v. *Esposito*, 13 Conn. App. 101, 106, 535 A.2d 364 (1987), cert. denied, 207 Conn. 807, 540 A.2d 375 (1988).

Apart from identifying the encroachments themselves, the defendants do not describe in their counterclaim the "encroached-upon portion" of the plaintiff's property they claimed to have acquired by adverse possession.

defendants alleged nuisance predicated on the plaintiff's alleged removal of "personal property from the disputed property," placement of stones on the defendants' garden "located in the disputed property," and placement of "a surveillance camera on the property line facing into the [defendants'] property and home." The defendants sought a judgment, pursuant to § 47-31, that they "are the owners of the encroached-upon property," "[a] temporary and permanent injunction prohibiting the plaintiff . . . from altering, damaging, or taking any action within the encroached-upon property," and monetary damages and costs. The defendants did not attach any exhibits to their counterclaim. On June 27, 2023, the plaintiff filed a reply to the special defense and an answer to the counterclaim, in which she denied, inter alia, the defendants' adverse possession special defense and their claim that title to the "encroached-upon property" had vested in them.

This case was tried to the court, *Stewart, J.*, on May 23 and 30, 2024.[5] The plaintiff testified as the only witness on her behalf and introduced exhibits into evidence that included a copy of the warranty deed that was conveyed to her when she purchased her property, correspondence, survey maps, field cards, Branford zoning board documents, and photographs and videos. The defendants presented testimony from Daniel as the only witness on their behalf and introduced exhibits into evidence that included a copy of the 1996 quitclaim deed described in footnote 2 of this opinion, receipts, a marked-up 2015 survey map, and photographs.

The plaintiff testified that, at the time she commissioned the initial survey of her property, the staking revealed what she had considered to be minor encroachments by the defendants. She explained that "roughly 80 percent of a shed and a 100 percent of an open but corralled . . . compost station" belonging to the defendants were located on her property. She described, and

[5]The court heard evidence on May 23, 2024, and closing arguments on May 30, 2024.

photographs and videos revealed, that the back portion of her property has "an upper area and big cliff . . . and then another extended lower area . . . ." It is the "extended lower area" that abuts the defendants' property, and this is where the encroachments she identified are located. This area was "very overgrown and unkempt."

The plaintiff further testified that she did not have any knowledge regarding what portion of her property the defendants were claiming to have acquired by adverse possession until she received from their counsel the copy of the 2015 survey map with the "[h]and drawn . . . red triangle that encloses the entire length of . . . our abutting property line and goes approximately eighty feet into the property line for a total of about twenty-five hundred square feet." According to the plaintiff, the area enclosed by the red triangle "was beyond the encroachments [she] had previously identified." She further explained that "the only encroachment that's shown on [the survey map she received from the defendants' counsel is] part of the shed. The compost structure thing is not here. So, it's just this shed partially encroaching, but yet this [2500 square feet] is all of what they wanted."[6]

The plaintiff testified that, after she received the marked-up survey map from the defendants' counsel, she conducted some research in the town of Branford's (town) records and learned that the defendants had sought a variance, in 2014 or 2015, to reduce the setback from the same property line they were disputing in their special defense and first count of their counterclaim, in order

---

[6]The 2015 survey map with the "red triangle" was admitted into evidence as an exhibit at trial. It depicts a box, identified as "SHED," that straddles the existing boundary line between the plaintiff's and the defendants' properties, with the majority of the box located on the plaintiff's side of the property line. Also depicted within the triangular area is a series of "little circles" that the plaintiff testified represented a "stone wall" that she described as "a crumbling stone gathering of rocks on [her] property." She also testified about, and presented photographs of, a PVC drainage pipe that extended from the defendants' property, underneath the "stone gathering of rocks" and discharged into a pond on her property. She considered the PVC pipe to be an encroachment but not the remains of the crumbling stone wall.

to enlarge the rear deck on their home. The plaintiff also located field cards for the defendants' property that the town used for taxing purposes, which she submitted into evidence. She explained that the field card dated 2013 identified a fireplace as an "outbuilding [and] yard item" but did not identify a shed. A later field card dated 2018, however, identified both a fireplace and a shed frame, from 2015, as "outbuilding[s] [and] yard items." As part of further research that she had conducted, the plaintiff also located two aerial photographs from 2008 that depicted her property and the defendants' property. She testified that there was not a shed or compost corral reflected in either photograph.

In addition, the plaintiff explained that, once she became aware of the defendants' claim to her land, she had her original survey revised to include the visible encroachments she was claiming.[7] She then sent correspondence to the defendants, through their counsel, demanding that they remove the encroaching "shed, compost corral, drainpipe and buried wire" from her property, and also filed a notice of interruption and dispute of claim with the town clerk. After the defendants refused to remove the encroachments, the plaintiff filed this action.

Daniel testified that he had been title owner of the defendants' property since 1985. He identified the disputed area that he and Gritli were claiming to have acquired by adverse possession as a 1202 square foot area near the existing property line, as reflected on a second marked-up version of the 2015 survey map the defendants introduced into evidence as an exhibit at trial. This second version of the 2015 survey map identifies both the original "property line to be removed" and the 1202 square foot area as the "proposed parcel to be merged

---

[7] The plaintiff testified that, while she was clearing out the lower area of her property, she uncovered a buried green wire on her property that ran to the defendants' property. She "had it checked [through] call before you dig kind of thing. And they said it was live and it originated from [the defendants' property]." The buried green wire, although one of the encroachments she is claiming, is not depicted on her revised survey map.

with #24 Stone Street." A "shed" is shown straddling the existing property line, but no other encroachments are depicted on that survey map.[8] Daniel confirmed that the surveyor did not return to the defendants' property to re-walk the land before identifying the disputed area on the second version of the 2015 survey map. He explained that the surveyor, instead, drew the proposed new boundary line based solely on Daniel's directive as to where it should be.

With respect to the duration of the defendants' alleged adverse possession of the disputed area of the plaintiff's property, Daniel testified that he and his family began utilizing it in 1985. He explained that his children had a sandbox and climbing structure that were located in the disputed area, which they had maintained for about five years until the children outgrew them. Daniel also constructed a stone wall and planted a garden in the disputed area in 1985.

Daniel testified that a doghouse, which had been constructed by previous owners of the defendants' property, was located within the disputed area when he purchased the property in 1985. The defendants replaced the doghouse with their first shed in approximately 1998. In early 2015, the defendants replaced that shed with one they had purchased from The Home Depot at the end of 2014.[9] It is the second shed that is currently encroaching on the plaintiff's property.

---

[8]During cross-examination, the plaintiff confirmed that she had learned "through the course of the litigation" that the defendants were not, in fact, claiming that they had adversely possessed the 2500 square foot "triangle area" reflected on the first marked-up version of the 2015 survey map. She later explained that this came to light during pretrial discovery when the defendants provided, with their responses to her interrogatories and production requests, the second marked-up version of the survey map.

[9]Daniel testified that the doghouse was "[m]aybe three feet by five feet" in size, that the first shed was "about eight by ten feet, approximately," and that the "new shed" was "approximately" the same size and dimension as the prior shed. Moreover, although Daniel also testified that the "new shed" was placed in the same location as the prior shed, the plaintiff testified, and the court found, that Daniel had told her that he "didn't tell them to put [the shed] there. I came home one day, and it was just there." Daniel did not testify, however, as to when

To rebut the plaintiff's testimony that suggested that there was no shed on the defendants' property in 2008 or at the time that the 2013 field card was created, Daniel introduced into evidence a photograph taken of the defendants' yard in 2011.[10] He explained that the shed was "the white structure on the left side of the photograph" and that "you have to look through the bushes to see it." Daniel also testified that two aerial photographs from 2008, which the court admitted into evidence as exhibits during the plaintiff's testimony, did show what he "believe[s] is the shed."

According to Daniel, the defendants constructed their compost corral in 1985. Although they had made various improvements to that structure over time, it existed more or less in the same location, completely within the disputed area, since then. He offered an April 2023 photograph of the defendants' compost corral at trial, which the court admitted into evidence and "show[ed] all the garbage . . . [the plaintiff] dumped" there. Although Daniel explained that he did not actually see the plaintiff put anything into the compost corral, it was "[his] inference that she did since nobody else has access to the area." He also testified that the plaintiff "destroyed" a flower bed within the disputed area "by cutting all the bushes out and digging up the flowers. She then proceeded to spray-paint it with red spray paint."

Daniel acknowledged that he had installed an electric dog fence on their property in approximately 1998 and confirmed that the green wire that the plaintiff had uncovered within the disputed area was a wire from that fence. According to Daniel, the drainpipe existed when he purchased the property in 1985.

Daniel testified that the defendants never requested permission to use the disputed area from the prior owners
_____
or by whom the prior shed was removed, and there is no documentary evidence in this regard.

[10]This photograph was admitted into evidence over the objection of the plaintiff's counsel. As support for its admission, the defendants' counsel explained that "[w]e are offering it in rebuttal to the testimony that there was an insinuation that there was no shed in 2011."

of the plaintiff's property and that the prior owners of the plaintiff's property never asked the defendants to remove their shed or compost corral therefrom. He explained that, at least initially, the defendants thought they owned the disputed area. Moreover, he confirmed that, even after surveys that the defendants had commissioned in or about 2014 or 2015 revealed the true property line, which Daniel testified went "through our shed and cut off the portion that included the disputed area," the defendants continued to use the disputed area of the plaintiff's property as if it was their own. He further testified that they "groomed the area, cut the grass, tended to the flowers, [and] used compost. We used the shed. We continued to tend the garden within the stone wall." Daniel confirmed, however, that the defendants did not notify the town of their adverse possession claim when they sought their variance.

With respect to the defendants' nuisance claim, Daniel testified that the plaintiff had installed "surveillance cameras," which she pointed at the defendants' property.[11] He "assume[d]" that, by doing so, the plaintiff "want[ed] to keep an eye on us." Daniel also testified, without objection, that the plaintiff had installed several motion activated noisemakers that made dog-barking and gunshot sounds. The plaintiff confirmed during her testimony that she had installed cameras to monitor the situation with respect to the placement of debris onto her property.[12] She also explained that she had installed

---

[11]The defendants had photographs of the "surveillance cameras pointed at [their] yard/house" photocopied together and introduced as one exhibit at trial. Daniel testified that one of the cameras "is pointed at [the defendants'] land and [the defendants'] house," and that the other "enjoys a view of [the defendants'] house and [the defendants'] porch." The photographs, however, depict the cameras themselves and not the area or areas captured in their respective views.

[12]More specifically, the plaintiff testified that she had installed the two cameras at issue because she "was concerned that [she] had not seen what was happening coming" and wanted "to maintain a record of the property while we went through this process." She explained that one of the cameras was "pointed toward the compost area or the shed" and offered into evidence a photograph that shows "what is captured by [that] camera . . . ." That photograph depicts, inter alia, trees and

noisemakers as an animal deterrent because there was an increase in coyotes, deer, fox and raccoons, and she was concerned about the safety of her dog. She removed the noisemakers at some point prior to the trial, however, because the animal activity had decreased.

On August 1, 2024, the trial court issued a memorandum of decision in which it found in favor of the defendants on all counts of the plaintiff's complaint and with respect to counts two and three of the defendants' counterclaim, which sounded in trespass and nuisance, respectively. The court determined, however, that the defendants could not prevail on count one of their counterclaim, which sought to quiet title in their favor to "the encroached-upon property . . . ." See footnote 1 of this opinion.

The predicate for the trial court's conclusions as to all but the defendants' nuisance claim was its resolution of the defendants' adverse possession special defense, which it addressed "first because it is directed to all three of the plaintiff's claims, and the outcome of that analysis affects those claims and the first two of the defendants' claims." After reciting the elements of adverse possession and acknowledging the "exacting standard" by which the defendants had to sustain their burden of proving those elements, which included overcoming the presumption "in favor of possession in subordination to the title of the true owner," the court explained that, although the defendants had established that "they ousted the plaintiff's predecessors from possession and kept them out

land covered by leaves and ground cover in the foreground, the shed and compost corral in the mid-ground and part of the defendants' home in the background. The plaintiff further testified that the other camera "was up on the cliff . . . about forty feet from the property line" and "was pointed in the same area so [she] could see what might be happening on the other side of [the] shed a little." She described that camera, itself, as "useless because there's so much vegetation, so it was taken down within a few weeks." Nonetheless, she offered another photograph into evidence that "is the image captured by the camera that was on the cliff." That photograph depicts part of the cliff, trees and heavy vegetation in the foreground, and what looks like one side of a shed and part of the defendants' house, obscured by leaves, in the background.

uninterruptedly under a claim of right by an open, visible and exclusive possession by the defendants without license or consent of the plaintiff's predecessors" for a period of ten years, they "did not provide clear and convincing evidence that they ousted the plaintiff and [her predecessors] from *possession of all of the disputed area* for fifteen years." (Emphasis added; internal quotation marks omitted.) The court explained that, "[b]ased on the 2022 and 2023 photographs and videotapes introduced by both parties, most of the land appears to have been covered in leaves year-round. The defendants' garden does not appear to [have been] actively maintained, and their play areas for their children appear to be long gone. There is no evidence after the first ten years that the defendants openly and visibly use[d] them, nor is there an ouster in those areas."

The trial court determined, however, that "[t]he stone wall and a compost structure have been present since 1985, the drainpipe predates 1985, and the shed and its predecessor have been on the property since 1998, and the dog fence was installed in 1998." Even so, the court acknowledged, with respect to the shed, that "[n]o shed appears on the 2013 assessor's card" and that it could not determine whether there was a shed depicted in the 2011 photograph the defendants had offered into evidence as an exhibit or in the 2008 aerial photographs that the plaintiff offered into evidence as exhibits. Moreover, the court noted, one of the defendants' April 2023 photographs "depicts the shed and the compost corral, but there are no other recognizable objects."

The trial court found that the defendants had "established that it is highly probably true that the stone wall, the shed and its predecessors, the compost corral and its predecessors, the drainpipe and the dog fence were openly and visibly present on the plaintiff's property continuously for at least fifteen years." As such, the court concluded that the defendants had established "their special defense of adverse possession as to the . . . encroachments . . . ." The court expressly stated,

however, that the defendants had "not established that defense as to any other part of the disputed area."

The trial court then addressed the plaintiff's three claims in her complaint and relied on its conclusion that the defendants had "established their special defense of adverse possession as to the encroachments" to reject each of the plaintiff's claims. Specifically, with respect to the plaintiff's trespass claim, the court explained that, "[b]ecause the defendants have established their special defense as to the encroachments, they had ousted the plaintiff of possession of the property in question, and therefore she cannot establish the first two elements" of her trespass claim. With respect to the plaintiff's claim for injunctive relief, the court simply stated that, "[b]ecause the defendants have established their special defense as to the encroachments, she cannot prevail on this claim." Finally, with respect to the plaintiff's quiet title claim, the court determined that the plaintiff had complied with § 47-31 (b), "which sets forth the requirements for a complaint in a quiet title action," specifically, that "[t]he complaint in such action shall describe the property in question and state the plaintiff's claim, interest or title and the manner in which the plaintiff acquired the claim, interest or title and shall name the person or persons who may claim the adverse estate or interest." (Internal quotation marks omitted.) The court found, nonetheless, that, "because the defendants have established their special defense as to the encroachments, the court cannot quiet title consistent with the legal description from the plaintiff's warranty deed that she has attached to the complaint."

The trial court, however, also declined to quiet title to the disputed area of the plaintiff's property in the defendants' favor. In addressing the first count of the defendants' counterclaim, in which they expressly sought "a judgment declaring that the title of the property is quieted and settled" in their favor, the court explained that the defendants had "not complied with the requirement in [§] 47-31 (b) that they 'describe the property in

question.' Their counterclaim does not include a property description. Although they introduced a survey as an exhibit at trial, that survey includes the entire 1202 square feet of the so-called disputed area. The court has determined that the defendants did not meet their burden of proving by clear and convincing evidence that they have title by adverse possession of that entire area." Moreover, the court further specified that the defendants had "not provided [it] with a property description of the encroachments that the court did find that the defendants had acquired by adverse possession." For these collective reasons, the court concluded that the defendants could not prevail on the quiet title count of their counterclaim. See footnote 1 of this opinion.

With respect to the defendants' trespass count of their counterclaim, the trial court found that "[t]he only acts of trespass by the plaintiff that were established at trial were the plaintiff's erection of a temporary fence and her placement of debris from the disputed area into the compost corral. She also uprooted a daffodil and spray-painted the former garden by the stone wall, but the defendants did not establish an ownership interest by adverse possession for that area." Although the court did not assess damages against the plaintiff for trespass, it did "enjoin [her] from further trespass on the encroachments and . . . order[ed] her to remove the fence insofar as it goes through or precludes the defendants' access to their encroachments." The court also "enjoined [the plaintiff] from placing debris in the compost corral."

Finally, with respect to the defendants' nuisance count of their counterclaim, the court concluded, after reciting the elements of nuisance, that "[t]he plaintiff's placement of cameras directed onto the defendants' property and her use of noisemakers constitute[d] a nuisance. *She will be enjoined from further deployment of those objects.*" (Emphasis added.) The court then issued the following order: "The plaintiff is enjoined from altering, damaging or taking any action, including debris disposal, with respect to the following encroachments that the court

has determined are owned by the defendants*:* **(1)** a stone wall, **(2)** a drainpipe *underneath that stone wall*, **(3)** an *underground dog fence*, **(4)** a shed, and **(5)** a compost corral. She is further ordered to remove any fencing along the parties' property line that interferes with or precludes the defendants' access to any of the above-listed encroachments. *The plaintiff is also enjoined from directing cameras at the defendants' property* or from deploying noisemaking devices." **(**Emphasis added**.)**

This appeal by the plaintiff, from all orders adverse to her, followed. The defendants did not file a cross appeal; see footnote 1 of this opinion; nor did they raise any alternative grounds for affirming the trial court's judgment. Additional facts and procedural history will be set forth as necessary.

Before we address the plaintiff's specific claims, we set forth general legal principles concerning the doctrine of adverse possession, which formed the basis for **(1)** the special defense the trial court determined the defendants had established as to their encroachments, **(2)** the quiet title count of their counterclaim on which the court concluded the defendants had not prevailed, and **(3)** the court's resolution of all of the parties' respective claims, except the count of the defendants' counterclaim alleging nuisance. "Adverse possession is a method whereby a person who was not the owner of property obtains a valid title to that property by the passage of time. The concept of adverse possession allows a person to claim title to property presently titled in another and permits one to achieve ownership of another's property by operation of law. Adverse possession is thus recognized as a mode or method of acquiring title to property, but it is not a favored one." **(**Footnotes omitted.**)** 3 Am. Jur. 2d 96, Adverse Possession § 1 **(**2024**)**.

"Despite extensive case law on the subject, the root of adverse possession in our law is statutory.[13] General

---

[13]"Although the scheme of adverse possession in Connecticut, like that of all other states, is based on a statute of repose for actions against an adverse possessor, the mere existence of such statutes does not compel

Statutes § 52-575 (a)[14] establishes a fifteen year statute of repose on an action to oust an adverse possessor." **(Footnotes in original.)** *O'Connor* v. *Larocque*, 302 Conn. 562, 578–79, 31 A.3d 1 (2011). "The purpose of adverse possession statutes is to quiet title to property, and the intention of such statutes is not to punish one who neglects to assert rights but to protect those who have maintained the possession of property for the time specified by the statute under claim of right or color of title." **(Footnote omitted.)** 3 Am. Jur. 2d, supra, § 6, p. 100. "Title by adverse possession is sufficient to sustain

the existence of adverse possession in the form that we know today. To the contrary, '[b]y their terms, most statutes of limitation [including Connecticut's] merely terminate the record owner's access to judicial assistance in recovering possession of his land. The doctrine of adverse possession takes these statutes one conceptual step further by providing that the adverse possessor . . . actually gains legal title, displacing the record owner . . . . This result does not flow ineluctably from the language of the statutes.' [Footnote omitted.] J. Stake, 'The Uneasy Case for Adverse Possession,' 89 Geo. L.J. 2419, 2421–22 (2001)." *O'Connor* v. *Larocque*, 302 Conn. 562, 578 n.14, 31 A.3d 1 (2011).

[14]"General Statutes § 52-575 (a) provides: 'No person shall make entry into any lands or tenements but within fifteen years next after his right or title to the same first descends or accrues or within fifteen years next after such person or persons have been ousted from possession of such land or tenements; and every person, not entering as aforesaid, and his heirs, shall be utterly disabled to make such entry afterwards; and no such entry shall be sufficient, unless within such fifteen-year period, any person or persons claiming ownership of such lands and tenements and the right of entry and possession thereof against any person or persons who are in actual possession of such lands or tenements, gives notice in writing to the person or persons in possession of the land or tenements of the intention of the person giving the notice to dispute the right of possession of the person or persons to whom such notice is given and to prevent the other party or parties from acquiring such right, and the notice being served and recorded as provided in sections 47-39 and 47-40 shall be deemed an interruption of the use and possession and shall prevent the acquiring of a right thereto by the continuance of the use and possession for any length of time thereafter, provided an action is commenced thereupon within one year next after the recording of such notice. The limitation herein prescribed shall not begin to run against the right of entry of any owner of a remainder or reversionary interest in real estate, which is in the adverse possession of another, until the expiration of the particular estate preceding such remainder or reversionary estate.' " *O'Connor* v. *Larocque*, 302 Conn. 562, 578 n.15, 31 A.3d 1 (2011).

a judgment for [a] plaintiff in an action to quiet title." Id., § 236, p. 306.

"[W]hen title is claimed by adverse possession, the burden of proof is on the claimant. . . . The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without license or consent of the owner. . . . The use is not exclusive if the adverse user merely shares dominion over the property with other users. . . . Such a possession is not to be made out by inference, but by clear and positive proof. . . . In the final analysis, whether possession is adverse is a question of fact for the trier. . . . The doctrine of adverse possession is to be taken strictly. . . .

"Clear and convincing proof of the elements of an adverse possession claim is an exacting standard . . . that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true . . . . In evaluating a claim of adverse possession under that demanding standard, [e]very presumption is in favor of possession in subordination to the title of the true owner. . . . That presumption is rooted in the recognition that there are no equities in favor of a person seeking to acquire property of another by adverse holding. . . .

"The demanding burden placed on a party claiming adverse possession of the property of another reflects the fact that such actions are disfavored. . . . As the Supreme Court of Ohio explained, [a]dverse [p]ossession represents the forced infringement of a landowner's rights, a decrease in value of the servient estate, the encouraged exploitation and development of land, the generation of animosity between neighbors, a source of damages to land or loss of land ownership, the creation of forced, involuntary legal battles, and uncertainty

and perhaps the loss of property rights to landowners with seisin. . . . Accordingly, we have recognized that adverse possession is disfavored. . . . *Houck* v. *Board of Park Commissioners*, 116 Ohio St. 3d 148, 155, 876 N.E.2d 1210 (2007). Moreover, [a] successful adverse possession action results in a legal titleholder forfeiting ownership to an adverse holder without compensation. . . . [T]hat is why the elements of adverse possession are stringent. . . .

"[T]he question of whether the elements of an adverse possession claim have been established by clear and convincing evidence is a factual one subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . A trial court's findings in an adverse possession case, if supported by sufficient evidence, are binding on a reviewing court . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Mulvey* v. *Palo*, 226 Conn. App. 495, 500–503, 319 A.3d 211, cert. denied, 350 Conn. 902, 322 A.3d 1059 (2024). However, "[w]hether those facts make out a case of adverse possession is a question of law reviewable by this court." (Internal quotation marks omitted.) *O'Connor* v. *Larocque*, supra, 302 Conn. 573. Moreover, a "reviewing court may examine [a trial court's] conclusion of adverse possession on [the] basis of evidential facts when some or all of [the] facts found by [the] trial court appear to be legally or logically inconsistent with [its] conclusion." Id., 574.

I

The plaintiff first claims that the trial court improperly failed to settle title to the area of her property that the defendants claimed to have acquired by adverse possession, despite the fact that both the plaintiff and the defendants had sought a determination of their respective rights therein, and that title to that disputed area

should have been quieted in her favor. She argues that the court was required, as a matter of law, to settle title and that its decision to deny both of the competing claims to do so cannot stand because it left unresolved the critical issue of who holds title to the disputed area of the plaintiff's property. Moreover, she maintains that the court erroneously rendered judgment in favor of the defendants on her claim to quiet title and should have rendered judgment in her favor instead because **(1)** the court found that, unlike the defendants, she had fully complied with the statutory requirements for quieting title enunciated in § 47-31, and **(2)** the finding on which the court predicated its denial of her claim—that the defendants had established their special defense as to the encroachments—is "flawed" and should be reversed.[15]

The defendants do not directly respond to this claim by the plaintiff. In fact, they posit that, "[b]y memorandum of decision dated August 1, 2024, the . . . court quieted title to the disputed area in the plaintiff. However, the court also found that the defendants had acquired the right to continue to use the disputed area." What the defendants claim, with respect to the court's resolution of the parties' competing claims to quiet title, is that they had "proved that they had established an interest in the disputed area by adverse possession" and "disagree with the [court's] conclusion that they did not acquire title to the disputed area by adverse possession," which formed the basis for the judgment the court rendered against them on the first count of their counterclaim. They

[15]Specifically, the plaintiff claims, in two separate sections of her principal appellate brief that the trial court's "decision on the defendants' adverse possession special defense" (1) "directly contradicts" its denial of the defendants' quiet title claim and applies erroneous rules of law such that it is "legally and logically inconsistent," and (2) is not supported by the evidence. However, she incorporates by reference her challenge to the propriety of the court's "flawed finding of adverse possession," and the arguments she advances in support thereof, in advancing her first claim on appeal. As part of our resolution of the plaintiff's first claim on appeal, we will address the propriety of, and resolve her challenges to, the court's finding that the defendants "established their special defense of adverse possession . . . ."

further claim, "[i]n the alternative, [that they] established an easement to the disputed area" and "request that [this] court affirm the decision of the trial court." For the reasons that follow, we conclude that the court improperly failed to quiet title to the disputed area in the plaintiff's favor and that the judgment rendered in favor of the defendants on the third count of the plaintiff's complaint must be reversed.[16]

## A

We begin our analysis by interpreting the court's memorandum of decision with respect to its resolution of the parties' respective quiet title claims. "It is well settled that a judicial opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The construction of a judgment is a question of law for the court." (Internal quotation marks omitted.) *Rubin* v. *Brodie*, 228 Conn. App. 617, 655–56, 325 A.3d 1096 (2024).

---

[16]In reaching this conclusion, we do not consider the defendants' claim that they "proved that they had established an interest in the disputed area by adverse possession" and thus acquired title to the disputed area of the plaintiff's property because they did not file a cross appeal pursuant to Practice Book § 61-8. See footnote 1 of this opinion. The court's underlying findings and conclusion that the defendants could not prevail on their claim to quiet title set forth in the first count of their counterclaim are final and binding. See, e.g., *State* v. *Council*, 344 Conn. 113, 121, 277 A.3d 1251 (2022).

We also do not consider the defendants' alternative claim that they "established an easement to the disputed area." As the plaintiff argues in her reply brief, the defendants neither pleaded nor argued to the trial court that they had acquired an easement over her property. See, e.g., *U.S. Bank National Assn.* v. *Eichten*, 184 Conn. App. 727, 756, 196 A.3d 328 (2018) ("Our appellate courts, as a general practice, will not review claims made for the first time on appeal. We repeatedly have held that [a] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . ." (Internal quotation marks omitted.)). Nor, as the plaintiff also argues, did the defendants file a preliminary statement of issues raising their easement claim as a potential alternative ground for affirmance pursuant to Practice Book § 63-4 (a) (1) (A). See *Frantzen* v. *Davenport Electric*, 206 Conn. App. 359, 366 n.5, 261 A.3d 41, cert. denied, 339 Conn. 914, 262 A.3d 134 (2021).

In addressing the plaintiff's quiet title claim, although the trial court determined that the plaintiff had complied with the statutory "requirements for a complaint in a quiet title action" by describing her property, stating that she had acquired title to it by warranty deed, and identifying the defendants and their adverse claim thereto, the court nonetheless concluded that, "because the defendants have established their [adverse possession] special defense as to the encroachments, the court cannot quiet title consistent with the legal description from the plaintiff's warranty deed that she has attached to that complaint." In other words, the court determined that the plaintiff did not have good record title that entitled her to the judgment of ownership she was seeking; see *DeVita* v. *Esposito*, supra, 13 Conn. App. 106; and it did not honor and give effect to the description of the plaintiff's property and the boundary line set forth in her deed because of the defendants' encroachments. See, e.g., *Har* v. *Boreiko*, 118 Conn. App. 787, 795, 986 A.2d 1072 (2010) (to prevail in quiet title action plaintiff must prevail on strength of her own title). Thus, contrary to the defendants' claim, the court did not quiet title to the disputed area in favor of the plaintiff, despite her record ownership of the property.

The trial court also expressly concluded, however, that the defendants had not prevailed on their quiet title claim. As grounds for this conclusion, the court explained that, "[a]lthough [the defendants] introduced a survey as an exhibit at trial, that survey includes the entire 1202 square feet of the so-called disputed area. The court has determined that the defendants did not meet their burden of proving by clear and convincing evidence that they have title by adverse possession [to] that entire area."[17] Moreover, the defendants had "not provided the court with a property description of the encroachments

---

[17]The trial court made that determination when it addressed the defendants' adverse possession special defense, finding that "the defendants did not provide clear and convincing evidence that they ousted the plaintiff and [her predecessors] from possession of *all of the disputed area* for fifteen years." (Emphasis added.)

that the court did find that the defendants had acquired by adverse possession." Thus, despite having found that the defendants had established that they had acquired through adverse possession the encroached on portions of land within the disputed area of the plaintiff's property,[18]

[18]We note the trial court's lack of precision throughout its decision in referencing the defendants' having "established their special defense as to the encroachments . . . ." On one hand, in finding that the defendants had "established their special defense of adverse possession as to the . . . encroachments," the court identified the specific encroachments the defendants had seemingly adversely possessed but clearly specified that the defendants had "not established that defense as *to any other part of the disputed area*." (Emphasis added.) Similarly, when addressing the plaintiff's trespass claim, the court explained that, "[b]ecause the defendants have established their special defense as to *the encroachments*, they had ousted the plaintiff of possession of *the property in question* and, therefore, she cannot establish the first two elements of her trespass claim." (Emphasis added.) On the other hand, when addressing the plaintiff's claims for injunctive relief and to quiet title, the court simply found that the defendants had established their "special defense *as to the encroachments*," without referencing the property on which the encroachments are located, as grounds to reject her claims for injunctive relief and to quiet title. (Emphasis added.) Likewise, the court faulted the defendants for their failure to provide it "with a property description of *the encroachments* that the court did find that the defendants had acquired by adverse possession." (Emphasis added.) It is not surprising, therefore, that the plaintiff posits that the court found "adverse possession over encroachments (not land) . . . ." Indeed, this is not an unreasonable interpretation of the imprecise language used by the court in its decision. See, e.g., J. Mangiardi, "Return of Art & Artifacts: A Cultural 'Statute of Limitations' Return of Art & Artifacts: Is There an Appropriate Cultural 'Statute of Limitations'?," 52 Conn. L. Rev. Online 1, 4 (2020) ("[t]hough adverse possession originally applied only to real property, many jurisdictions now apply the doctrine to chattels").

In reading the trial court's decision as a whole and giving effect to what is clearly implied as well as to what is expressed, however; see, e.g., *Rubin* v. *Brodie*, supra, 228 Conn. App. 655–56; we construe the court's references to the defendants having established their special defense of adverse possession "as to the encroachments" as meaning that they had acquired by adverse possession those portions of the disputed area of the plaintiff's property on which the defendants' encroachments are located. To be sure, if we were to construe the court's decision as the plaintiff does, this would mean that the defendants *adversely* possessed personal property, that they already undisputedly owned and possessed, not real property belonging to the plaintiff, as the defendants alleged. Such a construction would not be consistent with the doctrine

and, notwithstanding that "adverse possession is . . . a mode or method of acquiring title to property"; 3 Am. Jur. 2d, supra, § 1, p. 96; the court did not quiet title in the defendants' favor to *any* portion of the disputed area of the plaintiff's property.[19] It is clear, therefore, based on our plenary review of the court's decision, that the court did not render judgment of ownership with respect to any portion of the disputed area of the plaintiff's property in favor of the plaintiff *or* the defendants; see *DeVita* v. *Esposito*, supra, 13 Conn. App. 106; and, thus, failed to settle the critical issue as to who holds title to the disputed area of the plaintiff's property. Under well established Connecticut law, however, "[t]he claim for relief called for a full determination of the rights of the parties in the *land*"; (emphasis added) *Lake Garda Improvement Assn.* v. *Battistoni*, 155 Conn. 287, 293, 231 A.2d 276 (1967); "clear[ing] up all doubts and disputes and . . . quiet[ing] and settl[ing] the title to the property." General Statutes § 47-31 (a).

Indeed, when the parties filed their claims to quiet title to the disputed area of the plaintiff's property in their favor, they invoked the remedy provided in § 47-31.[20] See

of *adverse* possession. See, e.g., *DeVita* v. *Esposito*, supra, 13 Conn. App. 107 ("one who has record title and, concomitantly also possesses the property does not thereby acquire title to the property by adverse possession"); see also *In re Denzel W.*, 225 Conn. App. 354, 373, 315 A.3d 346 ("[w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment" (internal quotation marks omitted)), cert. denied, 349 Conn. 918, 317 A.3d 1 (2024).

[19]We fail to understand, therefore, the defendants' assertion in their principal appellate brief that "[t]he plaintiff claims that the court erred in entering judgment in favor of the defendants on the first count of the counterclaim . . . ." The plaintiff has not challenged in this appeal the court's judgment in her favor as to count one of the defendants' counterclaim, nor have the defendants filed a cross appeal in relation thereto. See footnote 1 of this opinion. Indeed, the defendants also have posited inaccurately that, "[b]y memorandum of decision dated August 1, 2024, the . . . court quieted title to the disputed area in the plaintiff."

[20]Although the plaintiff did not expressly plead § 47-31 in the third count of her complaint, she labeled that count "quiet title" and requested "[a] judgment determining the rights [of] the parties in and to the land and settling the title thereto . . . ." By doing so, the plaintiff gave the defendants and the trial court clear notice that she was asserting a quiet

*DeVita* v. *Esposito*, supra, 13 Conn. App. 104. Section 47-31 (a) provides in relevant part: "An action may be brought by any person claiming title to, or any interest in, real or personal property, or both, against any person who may claim to own the property, or any part of it, or to have any estate in it, either in fee, for years, for life or in reversion or remainder, or to have any interest in the property, or any lien or encumbrance on it, adverse to the plaintiff, or against any person in whom the land records disclose any interest, lien, claim or title conflicting with the plaintiff's claim, title or interest, for the purpose of determining such adverse estate, interest or claim, *and to clear up all doubts and disputes and to quiet and settle the title to the property*. . . ." (Emphasis added.) Section 47-31 (b), in turn, provides in relevant part: "The complaint in such action *shall describe the property in question* and state the plaintiff's claim, interest or title and the manner in which the plaintiff acquired the claim, interest or title and shall name the person or persons who may claim the adverse estate or interest. . . ." (Emphasis added.) Finally, § 47-31 (f) provides: "The court shall hear the several claims and determine the rights of the parties, whether derived from deeds, wills or other instruments or sources of title, and may determine the construction of the same, *and render judgment determining the questions and disputes and quieting and settling the title to the property.*" (Emphasis added.)

"When a party seeks to quiet title pursuant to § 47-31, the court should first determine in which party record title lies, and then determine whether adverse possession has divested the record owner of title. . . . The initial question is whether record title is in one party or the other and, if so, the question becomes whether the record owner was divested of title by clear and positive proof of adverse possession of the other." (Internal quotation marks omit-

title claim. See *DeVita* v. *Esposito*, supra, 13 Conn. App. 104. Moreover, the court assessed both the plaintiff's and the defendants' claims to quiet title to the disputed area in accordance with this statute, and neither the plaintiff nor the defendants take issue with it having done so.

ted.) *Har* v. *Boreiko*, supra, 118 Conn. App. 794. "The procedure in an action to settle the title to land under the statute has been long and clearly established. . . . The essentials of the complaint were statements of the plaintiff's ownership in the land described and of [her] title thereto. . . . The action could be maintained against one in whom the land records disclose any interest, lien, claim or title conflicting with the plaintiff's claim, title or interest . . . . The claim for relief called for a full determination of the rights of the parties in the land. . . . The plaintiff was required not only to allege but to prove that [her] title was so affected by the claims of the defendants as to justify the litigation. . . . Finally, the plaintiff was required to prevail on the strength of [her] own title and not on the weakness of [her] adversary's title." (Citations omitted.) *Mierzejewski* v. *Laneri*, 130 Conn. App. 306, 310–11, 23 A.3d 82, cert. denied, 302 Conn. 932, 28 A.3d 344 (2011).

In *Lake Garda Improvement Assn.* v. *Battistoni*, supra, 155 Conn. 295–96, the trial court "undertook to determine the question of title but failed to make that positive determination of the rights of the parties which the statute contemplates" and made findings that did not determine "precisely where title lies." As such, our Supreme Court found error in the court's judgment. See id., 296–97. Likewise, in *Marquis* v. *Drost*, 155 Conn. 327, 231 A.2d 527 (1967), our Supreme Court deemed a judgment that did not "affirmatively adjudicate the title claims of [a] defendant . . . deficient in that it [did] not comply with the statutory mandate that the court, in a proceeding brought pursuant to . . . § 47-31 'shall . . . render judgment determining the questions and disputes and quieting and settling title to such property.'" Id., 333. The court's judgment in this case suffers from these same infirmities. Indeed, the court did not make a positive determination of the rights of the parties with respect to the disputed area of the plaintiff's property and did not determine with whom title to the disputed area lies.

As stated previously in this opinion, the trial court did not quiet title in the plaintiff's favor based on her record ownership of the disputed area because it determined that the defendants had "established their special defense [of adverse possession] as to the encroachments . . . ." See footnote 18 of this opinion. The court also expressly determined, however, that the "defendants did not meet their burden of proving by clear and convincing evidence that they have *title* by adverse possession of [the] entire [disputed] area" and did not quiet title to *any* portion of the disputed area in their favor, despite finding in favor of the defendants with respect to their special defense. (Emphasis added.) In other words, the court determined that record title to the disputed area rested with the plaintiff *and* that she had not been divested of any portion of that title by clear and convincing proof of adverse possession by the defendants. See *Har* v. *Boreiko*, supra, 118 Conn. App. 794. Instead of quieting title in the plaintiff's favor based on her undivested title, however, the court allowed the defendants' continued use of uncertain and indeterminate areas of the plaintiff's deeded property for their encroachments.[21]

---

[21] We note that, by doing so, the trial court, in the absence of any claim or presentment to it of the issue of prescriptive easement, may have inadvertently suggested that the defendants had acquired something more in the nature of a prescriptive easement over the portions of the disputed area of the plaintiff's property on which their encroachments are located, not that they had in fact acquired title to those portions of her property by adverse possession. See *Rubin* v. *Brodie*, supra, 228 Conn. App. 655–56. "[T]he benefit of an easement . . . is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose. . . . [E]asements are not ownership interests but rather privileges to use [the] land of another in [a] certain manner for [a] certain purpose . . . ." (Internal quotation marks omitted.) *Viering* v. *Groton Long Point Assn., Inc.*, 223 Conn. App. 849, 863, 311 A.3d 215, cert. denied, 349 Conn. 901, 312 A.3d 586 (2024).

"The legal principles governing a claim for a prescriptive easement are similar, *though not identical*, to those governing claims of adverse possession." (Emphasis added.) Id., 868. "The proper inquiry in evaluating a claim that easement rights have been acquired by prescription is whether the claimant adversely *used* the property at issue and not whether he adversely *possessed* that property." (Emphasis in original;

The trial court did not "clear up all doubts and disputes and . . . quiet and settle the title to the property," and "render judgment determining the questions and disputes and quieting and settling the title to the property" as § 47-31 required it to do. General Statutes § 47-31 (a) and (f). Indeed, the court, by its decision, allowed a cloud to remain on the plaintiff's undivested record title that negatively impacts its marketability.[22] The court's failure to settle title to the disputed area of the plaintiff's property, therefore, is contrary to law and cannot stand. See *DeVita* v. *Esposito*, supra, 13 Conn. App. 111 ("[w]here a decision ignores a clearly applicable statute, as it does here, it is contrary to the law and cannot stand").

B

Having concluded that the trial court committed error in failing to make a full determination of the rights of the

internal quotation marks omitted.) *Blow* v. *Konetchy*, 107 Conn. App. 777, 783, 946 A.2d 943 (2008).

The defendants, however, never pleaded or argued to the trial court that they had acquired an easement over the plaintiff's property. Rather, and notwithstanding the fact that the plaintiff affirmatively pleaded in the second count of her complaint that she was concerned that "a continuation of the encroachment may in the future ripen into *a prescriptive easement* or result in the defendants acquiring title to the encroachment area by *adverse possession*," the defendants' sole claim to the plaintiff's property was that they had acquired title to some portion of it by adverse possession. (Emphasis added.) The court failed to reference in its decision the law of prescriptive easement. Thus, we cannot read into its decision a finding that the defendants had established a prescriptive easement over the portions of the disputed area where their encroachments are located. See *Rubin* v. *Brodie*, supra, 228 Conn. App. 655–56. Any such finding would be improper and cannot be sustained. See, e.g., *Francis* v. *Hollauer*, 1 Conn. App. 693, 695–97, 475 A.2d 326 (1984) (reversing trial court's finding of prescriptive easement when such claim was not within issues alleged in pleadings).

[22]See, e.g., 65 Am. Jur. 2d 19, Quieting Title § 16 (2021) ("a ruling that effectively quiets title is appropriate where otherwise a cloud on title will exist with no purpose or enforceable right"); 77 Am. Jur. 2d 214–15, Vendor and Purchaser § 93 (2016) ("[a] marketable title is one that can be held or possessed in peace and quiet or, in other words, is one of such character as assures to the purchaser the quiet and peaceable enjoyment of the property and is not subject to a claim that could result in the property holder being dispossessed" (footnotes omitted)).

parties in the disputed area of the plaintiff's property by settling title thereto, we now turn to the appropriate remedy for that error. The plaintiff argues that the court erroneously rendered judgment in favor of the defendants on her claim to quiet title and that it should have rendered judgment in her favor, instead, because **(1)** the court found that, unlike the defendants, she had complied fully with the statutory requirements for settling title enunciated in § 47-31 and **(2)** the finding on which the court predicated its denial of her claim—that the defendants had established their special defense as to the encroachments—is "flawed" and cannot be sustained. She maintains that this court should reverse the trial court's "finding of adverse possession," and, thereafter, "all necessary facts and evidence [will] have been found in [her] favor concerning her quiet title claim." Thus, she claims that this court should reverse the trial court's judgment on the third count of her complaint and remand the case to that court with direction to quiet title in her favor to the disputed area of her property. We agree.

This court has explained that, "[i]n all actions to quiet title, there is a single statute . . . § 47-31, which is applicable to a plaintiff's claims . . . and which, in fact, supersedes any [common-law] actions brought to determine record title or to claim any interest in real property." (Citation omitted.) *DeVita* v. *Esposito*, supra, 13 Conn. App. 103–104. The trial court expressly found that the plaintiff had complied with the requirements of § 47-31 (b) in bringing her claim to quiet title in her favor, and that finding has not been challenged on appeal. The reason the court did not "quiet title consistent with the legal description from the plaintiff's warranty deed that she . . . attached to [her] complaint" was because it found that the defendants had established their special defense of adverse possession "as to the encroachments . . . ." For the reasons that follow, we conclude that all of the necessary elements of the defendants' adverse possession claim were not established by clear and convincing evidence; see *Mulvey* v. *Palo*, supra, 226 Conn. App. 503; and thus, as a matter of law, the defendants failed

to make out a case of adverse possession. See *O'Connor* v. *Larocque*, supra, 302 Conn. 573.

"When a party seeks to acquire by adverse possession a portion of real property belonging to another, that party bears the burden of establishing exclusive possession over all areas to which it lays claim. . . . As our Supreme Court has observed, [w]here a person claims land by adverse possession, his title is limited to the boundaries of his actual, exclusive occupation, and [cannot] extend beyond those boundaries. . . . [Thus] [t]o prevail on [an] adverse possession claim, it [is] . . . incumbent on the plaintiff to provide clear and convincing evidence as to the boundaries of those areas." (Citations omitted; internal quotation marks omitted.) *Mulvey* v. *Palo*, supra, 226 Conn. App. 511. When the court denied the defendants' claim to have title quieted in their favor, not only did it find that the defendants had not provided in support of their counterclaim a description of the *entire disputed area* of the plaintiff's property they were claiming to have acquired by adverse possession, it also found that they had "not provided [it] with a property description of *the encroachments* that the court did find that the defendants had acquired by adverse possession."[23] (Emphasis added.) In other words, the court expressly found that the defen-

---

[23] We note that the defendants claim they were "not required to provide a legal description" of the disputed area but that the second marked-up 2015 survey map depicting "the area of the disputed property as 1202 square feet" nonetheless established an "adequate record for the court to identify" the disputed area. Because the defendants did not file a cross appeal, they have abandoned this claim, and we do not consider it. See footnote 1 of this opinion; see also, e.g., *SMDV 1, LLC* v. *459-461 Pacific Street, LLC*, 233 Conn. App. 599, 606 n.4, 341 A.3d 304, cert. denied, 353 Conn. 919, 345 A.3d 808 (2025). Even so, and putting aside the fact that it was incumbent on the defendants to provide clear and convincing evidence of the boundaries of the area they claimed to have acquired by adverse possession; see *Mulvey* v. *Palo*, supra, 226 Conn. App. 511; the distinct issue for purposes of our analysis, given the court's finding as to their adverse possession special defense, is the defendants' failure to provide the court with a property description of the *specific portions within the disputed area of the plaintiff's property on which their encroachments are located*, and they do not claim to have done so.

dants had not provided *any* evidence, let alone clear and convincing evidence, as to the boundaries of the area or areas of the plaintiff's property that their encroachments occupied, and, thus, there was no evidence to support the court's conclusion that they had established their special defense of adverse possession as to the encroachments. It was the defendants' burden to prove title by adverse possession, and they were required to rely on the strength of their own title to do so. See *Mierzejewski* v. *Laneri*, supra, 130 Conn. App. 310–11.

This court's recent decision in *Mulvey* v. *Palo*, supra, 226 Conn. App. 495, is instructive. In *Mulvey*, the plaintiff brought an action in which she claimed to have acquired by adverse possession a 0.22 acre portion of the defendants' abutting property. Id., 498–99. After a trial to the court, the court found that, although the plaintiff had presented evidence that, for a period of nineteen years her late husband had demonstrated "possession of *some areas* on the disputed [portion] as would an owner thereof," she had not presented evidence that "demonstrated possession of all areas of the disputed portion of the defendants' property." (Emphasis in original; internal quotation marks omitted.) Id., 499. Moreover, "[t]he court further found that the precise boundary lines of those areas over which [the plaintiff's late husband] had demonstrated exclusive possession were uncertain and indeterminate." Id., 500. The court therefore "concluded that it could not 'identify the boundary lines of property supposedly acquired by adverse possession with any confidence'"; id., 510; determined that the plaintiff had not satisfied her burden of proving her adverse possession claim; and rendered judgment in favor of the defendants on the plaintiff's claim of adverse possession accordingly. See id., 500.

On appeal to this court, the plaintiff challenged, inter alia, the trial court's conclusion "that she failed to establish the boundaries of the areas of the disputed portion with reasonably certainty." Id., 509. This court determined, however, that the record substantiated those

findings by the trial court and that they were not clearly erroneous, and affirmed the trial court's judgment. See id., 513.

In doing so, this court explained that "[r]equiring a plaintiff in an adverse possession action to provide clear proof of the precise boundaries of the real property in question is consistent with the precept that '[a] landowner claiming more property than the claimant's title reflects bears the burden of proof in [a] boundary dispute, while the neighboring adjacent landowners, relying on the title, do not bear the burden of proving the boundary.' 11 C.J.S. 218, Boundaries § 186 (2021); accord *Steinman* v. *Maier*, 179 Conn. 574, 575, 427 A.2d 828 (1980) ('[t]he burden was on the plaintiff to fix [the] location' of boundary in dispute); *Velsmid* v. *Nelson*, 175 Conn. 221, 224, 397 A.2d 113 (1978) ('[a] plaintiff's claim may fail simply as a result of his or her inability to establish adequately the disputed boundary line'); *LaFreniere* v. *Gallinas*, 148 Conn. 660, 665, 174 A.2d 46 (1961) (plaintiff alleging possession of disputed area in boundary dispute 'is obliged to locate the boundary line'); *Simmons* v. *Addis*, 141 Conn. 738, 741, 110 A.2d 457 (1954) ('[t]he burden of establishing the location of the boundary line where he claimed it to be was upon the plaintiff'). The court's finding . . . that the plaintiff had not established with any reasonable certitude the boundaries of any areas over which she had claimed exclusive possession comports with that bedrock real property principle. Requiring such proof is consonant with the maxim that a claim of adverse possession, and the evidence submitted in support thereof, must be strictly construed against the party who is seeking to forever alter the boundaries of the title owner's property." *Mulvey* v. *Palo*, supra, 226 Conn. App. 512–13.

Our decision in *Mulvey* makes clear then, that, in the present case, the defendants' failure to provide the trial court with a "property description of the encroachments," as the court found; see footnote 18 of this opinion; defeats any claim that they "established their special

defense of adverse possession as to the . . . encroachments . . . ."[24] Although the court found it "highly probably true that the stone wall, the shed and its predecessors, the compost corral and its predecessors, the drainpipe and the dog fence were openly and visibly present on the plaintiff's property continuously for at least fifteen years," the fact remains that, without a property description of the areas within the disputed area of the plaintiff's property where those encroachments were located, "the precise boundary lines of those areas over which [the court found the defendants] had demonstrated exclusive possession were uncertain and indeterminate," and the court should have concluded that the defendants failed to prevail on their adverse possession special defense.[25] *Mulvey* v. *Palo*, supra, 226 Conn. App. 500.

Accordingly, we conclude that the defendants did not establish their special defense of adverse possession as to the encroachments and reverse the trial court's judgment

[24]Indeed, in its decision, the trial court expressly acknowledged that, "[i]n *Mulvey*, the Appellate Court affirmed a trial court decision that rejected an adverse possession claim where the plaintiff only demonstrated possession of some of the areas and had failed to provide clear and convincing evidence of the boundaries of those areas."

[25]We note that the plaintiff also challenges the propriety of the trial court's finding that the defendants had established that their encroachments were "openly and visibly present on the plaintiff's property continuously for at least fifteen years" and that the defendants "exclusively possessed" the property on which the encroachments were located for that period of time. In light of our conclusion that the court's determination that the defendants had "established their special defense of adverse possession as to the . . . encroachments" cannot be sustained because they did not provide clear and convincing evidence of the boundaries of the disputed area in which the encroachments are located, we need not address these alternative contentions. See *Durkin Village Plainville, LLC* v. *Cunningham*, 97 Conn. App. 640, 651, 905 A.2d 1256 (2006) (failure to prove any element of adverse possession is fatal to claim). Even so, we are compelled to note that the record does not reflect that there was a visible "dog fence" encroaching on the plaintiff's property, as the court found. Indeed, the court itself referenced a "*buried wire*" that it described as a "remnant" of the "*underground* electric dog fence [that the defendants had installed on their property] in November 1998." (Emphasis added.) Moreover, the plaintiff testified that she had found the "buried green wire" while "digging out some other debris" on her property. Likewise, the court described the drainpipe as "*run*[*ning*]

finding to the contrary. For this reason, we further conclude that, given the plaintiff's compliance with § 47-31 (b), on remand, title to the disputed area of her property should be quieted in her favor and judgment rendered for her on count three of her complaint.

## II

We now turn to the plaintiff's claims that the judgment rendered in favor of the defendants as to (1) her claims for trespass and injunctive relief, set forth in counts one and two of her complaint, and (2) the defendants' claim for trespass set forth in count two of their counterclaim, each of which is predicated on the trial court's improper determination that the defendants had

---

*under*" or "*pok*[*ing*] *out through*" the stone wall and, in its order, referenced "a drainpipe *underneath* that stone wall," and those descriptions are consistent with the photographic evidence presented at the trial, which depicts the drainpipe at the very bottom of a rock formation in an area covered by "unraked leaves on the ground." (Emphasis added.) It is not at all clear to us, therefore, that, even if the defendants had provided the court with a description of the boundaries of the encroached on areas of the plaintiff's property, they satisfied the "open and visible" element of adverse possession as to the buried wire and the drainpipe. See *Viering* v. *Groton Long Point Assn., Inc.*, 223 Conn. App. 849, 874, 311 A.3d 215 ("Open generally means that the use is not made in secret or stealthily. It may also mean that it is visible or apparent." (Internal quotation marks omitted.)), cert. denied, 349 Conn. 901, 312 A.3d 586 (2024). Indeed, the trial court itself acknowledged that "[t]he open and visible element requires a fact finder to examine the *extent and visibility* of the claimant's use of the record owner's property so as to determine whether a reasonable owner would believe that the claimant was using that property as his or her own." (Emphasis added; internal quotation marks omitted.)

In addition, given Daniel's imprecise testimony as to the dimensions of the "shed and its predecessors" and the lack of evidence regarding the dimensions of the "compost corral and its predecessors," we question how the defendants could have established that the existing shed and the existing compost corral occupied the same portions of the plaintiff's property *uninterruptedly* for fifteen years, as the court found. See *Mulvey* v. *Palo*, supra, 226 Conn. App. 500. Indeed, as previously noted, there is no evidence in the record regarding when and how the first shed was removed, and the court found that Daniel had explained to the plaintiff that he did not tell the individuals who delivered the second shed in early 2015 where on the property it should be placed. Rather, he "came home one day, and [the shed] was just there."

established their "special defense of adverse possession as to the . . . encroachments," involved errors of law and should be reversed.[26]

## A

The plaintiff addresses her claims for trespass and injunctive relief collectively in her principal appellate brief, arguing that the "defendants' encroachments onto [her] property constitute a trespass for which [she] is entitled to injunctive relief and damages," and that the trial court erroneously concluded otherwise. She posits that the evidence presented at trial established each of the elements of her trespass claim against the defendants and that she is entitled to damages and an order directing the defendants to remove their encroachments from and to remediate the damage they caused to her property. The defendants do not respond to these arguments. We agree with the plaintiff.

The essential elements of a claim for trespass are **(1)** ownership or possessory interest in land by the plaintiff; **(2)** invasion, intrusion or entry by the defendants affecting the plaintiff's exclusive possessory interest; **(3)** done intentionally; and **(4)** causing direct injury. See *Walters*

[26]The plaintiff advances these claims under a heading in her principal appellate brief that reads: "This court should reverse the trial court's decision on the defendants' trespass, nuisance, and injunctive relief claims and on the plaintiff's trespass claim." For ease of discussion, we address separately the plaintiff's challenge to the judgment rendered against her with respect to the defendants' nuisance count of their counterclaim, as that judgment was not predicated on the trial court's improper conclusion that the defendants had established their adverse possession special defense as to the encroachments. Moreover, we address the plaintiff's claims in a different order than she presents them in her brief. Specifically, we first address the plaintiff's claims regarding the court's resolution of her trespass and injunctive relief claims, which are set forth in counts one and two, respectively, of her complaint. We then address the plaintiff's claim regarding the court's resolution of the defendants' trespass claim, and their corresponding claim for injunctive relief, set forth in count two of their counterclaim. Finally, we address the plaintiff's claim regarding the court's resolution of the defendants' nuisance claim, and their corresponding claim for injunctive relief, set forth in count three of their counterclaim.

v. *Servidio*, 227 Conn. App. 1, 29, 320 A.3d 1008 (2024). "An action for damages for trespass is a possessory action . . . for which title is only incidentally relevant. . . . When an injunction is sought to restrain a trespass, however, title is an essential element in a plaintiff's case. . . . Consequently, where both damages for trespass and an injunction are sought, both title to and possession of the disputed area must be proved . . . and the burden of proving them is on the plaintiff." (Citations omitted.) *McCullough* v. *Waterfront Park Assn., Inc.*, 32 Conn. App. 746, 749, 630 A.2d 1372, cert. denied, 227 Conn. 933, 632 A.2d 707 (1993).

"[T]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Walters* v. *Servidio*, supra, 227 Conn. App. 29.

In rejecting the plaintiff's claim that the "defendants' encroachments constitute[d] a trespass on her property," the trial court determined that, "[b]ecause the defendants have established their special defense as to the encroachments, they had ousted the plaintiff of possession of the property in question, and therefore she [could not] establish the first two elements of her trespass claim." As we determined in part I of this opinion, the defendants failed to establish their special defense of adverse possession as to the portions of the disputed area on which their encroachments are located and that title to the entire disputed area should be quieted in the plaintiff's favor. As the proven record titleholder to the disputed area of her property, the plaintiff has an "ownership or possessory interest in the land," and there is no dispute that the defendants' encroachments, i.e., the "shed, compost corral, drainpipe, debris and waste

and buried wire" identified in her complaint,[27] intrude on her property and affect her exclusive possessory interest therein. Moreover, the court found that "[t]he defendants thought that they owned the [disputed areas of the plaintiff's] property until 2014" and that there is no dispute that they continued to use those areas for their encroachments thereafter. This establishes that their continued intrusions onto the plaintiff's property were intentional. Finally, as the court explained, this issue came to light when the plaintiff commissioned a survey "so that she could install fencing along the boundary line to contain her dog," and it is undisputed that the defendants' encroachments have interfered with her ability to do so. This, in and of itself, evinces injury.

The trial court's findings that the plaintiff had not established the first two elements of her trespass claim are clearly erroneous. Moreover, although the court did not address the second two elements of the plaintiff's trespass claim, the findings it made coupled with the undisputed facts allow us to conclude, as a matter of law, that the plaintiff had established them. See, e.*g.*, *Lopez* v. *William Raveis Real Estate, Inc.*, 343 Conn. 31, 57, 272 A.3d 150 (2022) ("if the evidence necessary for resolution is undisputed, then this court can decide the issue as a matter of law without need for a remand for factual findings"). Thus, the plaintiff established each of the four elements of her trespass claim. See *Walters* v. *Servidio*, supra, 227 Conn. App. 29. Moreover, as the record titleholder, the plaintiff would be entitled to damages and injunctive relief, if proven. See *McCullough* v. *Waterfront Park Assn., Inc.*, supra, 32 Conn. App. 749. Accordingly, we determine that the court's conclusion that the plaintiff did not establish her trespass claim fails as a matter of law and that the court, therefore, improperly rendered judgment in favor of the defendants

---

[27]Although the trial court identified the stone wall as one of the encroachments, it did so in the context of assessing the defendants' adverse possession special defense. The plaintiff did not identify the stone wall as an encroachment in her complaint and testified at trial that she did not consider it to be an encroachment.

with respect to the plaintiff's trespass and injunctive relief claims set forth in the first and second counts of her complaint.

B

We next address the plaintiff's claims that the trial court erroneously rendered judgment in favor of the defendants as to their trespass claim set forth in the second count of their counterclaim, improperly enjoined her from "further trespass on the encroachments" and "placing debris into the compost corral," and improperly ordered her "to remove the [temporary] fence insofar as it goes through or precludes the defendants' access to their encroachments." She maintains that the court's "decision was legally and logically inconsistent" in finding (1) "trespass for a party who did not have title" and (2) "trespass as to encroachments, not land." The defendants argue that they proved their trespass claim. They maintain that "courts have recognized that the *owner of an easement* has protected legal rights free from interference by the dominant estate" (emphasis added); see footnote 16 of this opinion; posit that, "at the very least, the court held that [the defendants] had some type of possessory interest in the disputed portion of the property"; and insist that the plaintiff interfered with that interest. Thus, they argue that the court properly rendered judgment in their favor. We agree with the plaintiff's first contention and, for the reasons set forth in footnote 18 of this opinion, do not address her second contention.

As explained in part II A of this opinion, the plaintiff established each of the four elements of her trespass claim against the defendants. Most notably, she established that *she* is the record owner of the entirety of her property, including the disputed area where the defendants' encroachments are located. See *Walters* v. *Servidio*, supra, 227 Conn. App. 29. Moreover, to the extent the trial court may have found that the defendants had "some type of possessory interest" in portions of the plaintiff's property, as the defendants maintain, this court has explained that any such finding would be

improper. Thus, as the record owner in exclusive possession of her property, she cannot, as a matter of law or fact, trespass thereon. See, e.*g.*, *Boyne* v. *Glastonbury*, 110 Conn. App. 591, 599–600, 955 A.2d 645 (explaining that trespass involves acts that interfere with plaintiff's exclusive possession of real property), cert. denied, 289 Conn. 947, 959 A.2d 1011 (2008).

Accordingly, we conclude that the trial court improperly rendered judgment in favor of the defendants as to the trespass claim set forth in the second count of their counterclaim. Consequently, the court improperly (1) enjoined the plaintiff from "further trespass" on the encroachments on her property and (2) ordered her to remove the temporary fence that she had installed.[28]

## III

Finally, we turn to the plaintiff's claims that the trial court erroneously rendered judgment in favor of the defendants with respect to their nuisance claim set forth in the third count of their counterclaim, and improperly enjoined her from "directing cameras at the defendants' property" and from "deploying noisemaking devices." The plaintiff argues that the court's determination that these actions constituted a nuisance is conclusory. She maintains that the court's finding of nuisance as to the cameras was improper because "no injuries or damages were identified [by the court], and no causal connection [was] made to [her] actions . . . ." She further argues that the court improperly exceeded the parameters of the defendants' allegations in concluding that her "use of noisemakers constitutes a nuisance." The defendants argue, in response, that "there is substantial evidence in the record to support the court's finding that the plaintiff

---

[28]We note that, even if the trial court's judgment in favor of the defendants on their trespass claim against the plaintiff had been correct, given its determination that the defendants had not prevailed on their claim to quiet title to any portion of the plaintiff's property in their favor, the order awarding the defendants injunctive relief for that trespass, would not properly follow. See *McCullough* v. *Waterfront Park Assn., Inc.*, supra, 32 Conn. App. 749 ("[w]hen an injunction is sought to restrain a trespass . . . title is an essential element in a plaintiff's case").

engaged in behavior which constituted a nuisance," and that, consequently, "the court, as the trier of fact, made a decision supported by the record." We agree with the plaintiff.

We begin by setting forth the legal principles and standard of review that are germane to our resolution of this claim. "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land. . . . The law of private nuisance springs from the general principle that [i]t is the duty of every person to make a reasonable use of his [or her] own property so as to occasion no unnecessary damage or annoyance to his neighbor. . . . Determining unreasonableness is essentially a weighing process, involving a comparative evaluation of conflicting interests. . . . Unreasonableness cannot be determined in the abstract, but, rather, must be judged under the circumstances of the particular case. . . .

"To recover damages in a private nuisance cause of action, a plaintiff must demonstrate that a defendant's conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property. . . . Such interference may be either intentional or the result of a defendant's negligence. . . . Ultimately, the question of reasonableness is whether the interference is beyond that which the plaintiff should bear, under all of the circumstances of the particular case, without being compensated. . . .

"Whether the interference is unreasonable depends upon a balancing of the interests involved under the circumstances of each individual case. In balancing the interests, the fact finder must take into consideration all relevant factors, including the nature of both the interfering use and the use and enjoyment invaded, the nature, extent and duration of the interference, the suitability for the locality of both the interfering conduct and the particular use and enjoyment invaded, whether the defendant is taking all feasible precautions to avoid any unnecessary interference with the plaintiff's use and enjoyment of his or her property, and any other factors

that the fact finder deems relevant to the question of whether the interference is unreasonable. No one factor should dominate this balancing of interests; all relevant factors must be considered in determining whether the interference is unreasonable. . . . Further, [t]he determination of whether the interference is unreasonable should be made in light of the fact that some level of interference is inherent in modern society. There are few, if any, places remaining where an individual may rest assured that he [or she] will be able to use and enjoy his [or her] property free from all interference. Accordingly, the interference *must be substantial* to be unreasonable. . . . Moreover, while the reasonableness of a defendant's conduct is a factor in determining whether an interference is unreasonable, it is *not* an independent element that must be proven in order to prevail in all private nuisance causes of action. The inquiry is cast more appropriately as whether the defendant's conduct unreasonably interfered with the plaintiff's use and enjoyment of his or her land rather than whether the defendant's conduct was itself unreasonable. . . .

"Whether an interference is unreasonable is a question of fact for the fact finder. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *Giglio* v. *Ardohain*, 233 Conn. App. 743, 749–52, 341 A.3d 272 (2025). Moreover, "[o]n appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court." (Internal quotation marks omitted.) *Nettleton* v. *C & L Diners, LLC*, 219 Conn. App. 648, 663, 296 A.3d 173 (2023).

In its memorandum of decision, the trial court made the following factual findings related to the defendants' nuisance claim: "The plaintiff installed cameras on her property. She did this because she was concerned that the defendants would move objects [into] the disputed

area." The court also found that, "[i]n January 2024, [the plaintiff] . . . installed a noisemaking device that makes dog and gunshot noises. She did this because she noticed that the composting had resumed, and she claims it attracted coyotes. She took down the device in April 2024, when the animal activity decreased."

Thereafter, in rendering judgment in favor of the defendants on the nuisance claim set forth in the third count of their counterclaim, the trial court stated: " '[T]o recover damages in a common-law private nuisance cause of action, a plaintiff must show that the defendant's conduct was the proximate cause of an unreasonable interference with the plaintiff's use and enjoyment of his or her property. The interference may be either intentional . . . or the result of the . . . negligence.' *Ugrin* v. *Cheshire*, 307 Conn. 364, 374, 54 A.3d 532 (2012), quoting *Pestey* v. *Cushman*, 259 Conn. 345, 361, 788 A.2d 496 (2002). The plaintiff's placement of cameras directed onto the defendants' property and her use of noisemakers constitutes a nuisance. She will be enjoined from further deployment of those objects." In its order, however, the court enjoined the plaintiff "from *directing cameras at the defendants' property* or from *deploying noisemaking devices*." (Emphasis added.)

At the outset, we note that "[i]t is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint. . . . The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise." (Citation omitted; internal quotation marks omitted.) *Durkin Village Plainville, LLC* v. *Cunningham*, supra, 97 Conn. App. 647. Because the defendants did not allege that the plaintiff's "use of noisemakers constitutes a nuisance"[29] but the court nonetheless found that it did,

---

[29]Although Daniel testified, without objection, that the plaintiff had installed on her property motion activated noisemakers that made dog-barking and gunshot sounds, the defendants did not reference noisemakers anywhere in their counterclaim, let alone allege that they constituted a nuisance in the third count thereof, as the plaintiff argues in her principal appellate brief. Nor did the defendants seek to amend

the court erred in its ruling with respect to the noise-making devices. See *Matto* v. *Dan Beard, Inc.*, 15 Conn. App. 458, 477, 546 A.2d 854, cert. denied, 209 Conn. 812, 550 A.2d 1082 (1988).

Moreover, the trial court engaged in no analysis and made no findings that support its conclusion that "placement of cameras directed onto the defendants' property . . . constitutes a nuisance." The court did not balance the interests involved by considering *any* of the relevant factors for determining whether the plaintiff's use of cameras was unreasonable under the circumstances. See *Giglio* v. *Ardohain*, supra, 233 Conn. App. 753 (trial court "considered all the relevant factors, including the nature of the interfering use as well as the use and enjoyment of [the] property that was being invaded" before properly finding that plaintiff had not established claim of private nuisance). Inscrutably, the court did not find that the plaintiff's conduct in installing the cameras *was unreasonable*, let alone that the cameras unreasonably interfered with the defendants' use and enjoyment of their land. Instead, the court summarily determined that the plaintiff's placement of her cameras was a nuisance.

Further, in doing so, the trial court made only two express "findings of fact" regarding the cameras, i.e., that the plaintiff had "[1] installed [them] on her property . . . [2] [and did so] because she was concerned that the defendants would move objects [into] the disputed area." The court also noted, in reaching its conclusion, that the plaintiff's cameras were "directed onto the defendants' property . . . ." We have thoroughly reviewed the record and conclude that the only evidence that the plaintiff's cameras were directed onto the defendants' property was the testimony of Daniel.

Daniel testified only that the plaintiff had installed

their counterclaim to conform to the evidence at trial. See, e.*g.*, *KDM Services, LLC* v. *DRVN Enterprises, Inc.*, 211 Conn. App. 135, 140, 271 A.3d 1103 (2022) ("[a] trial court may allow, in its discretion, an amendment to pleadings before, during, or after trial to conform to the proof" (internal quotation marks omitted)).

surveillance cameras directed at the defendants' property. To this end, he explained that one camera was "pointed at [the defendants'] land and [the defendants'] house," and that the other camera "enjoy[ed] a view of [the defendants'] house and [the defendants'] porch." The photograph he relied on when making these assertions, however, merely showed the cameras themselves and failed to support his testimony.

The plaintiff testified that one of the cameras was "pointed toward the compost area or the shed" and offered into evidence a photograph that depicts that. Part of the defendants' house is visible in the background. The plaintiff further testified that the other camera, which she had removed by the time of trial, "was pointed in the same area," albeit from a vantage point that was farther away from the property line than the other camera. The photograph she had admitted into evidence that showed "what is captured by [that] camera" depicted what looks like one side of the shed and part of the defendants' house, both obscured by leaves, in the background.

Significantly, Daniel did not testify or offer any documentary evidence to support the conclusion that the cameras interfered with the defendants' use and enjoyment of their property in any way, let alone to what extent. Although he assumed that the plaintiff had wanted "to keep an eye on [the defendants]" by using the cameras, he expressed no concerns whatsoever about the defendants' privacy being invaded or about being surveilled; see, e.g., *Ursitti* v. *Wilson*, Docket No. A-0200-22, 2024 WL 481066, *3 (N.J. Super. App. Div. February 8, 2024) (defendants claiming nuisance testified that "they felt their privacy had been invaded by the cameras" and that "it felt 'creepy' being constantly surveilled"); nor did he state that the defendants curtailed or in any way altered their activities inside or outside of their home because of the cameras. See, e.g., *Scott* v. *Nameth*, Docket No. 14AP-630, 2015 WL 1303100, *1 (Ohio App. March 24, 2015) (plaintiffs claiming nuisance averred that because of defendants' cameras they did not have full use of inside

or outside of their house, did not open certain blinds or curtains, and entertained in their yard infrequently). In other words, even if the trial court had attempted to balance the competing interests involved with respect to the plaintiff's use of her cameras, as it should have, there is no evidence in the record by which it could have properly determined, after considering all of the relevant factors, that the plaintiff's cameras unreasonably interfered with the defendants' use and enjoyment of their property.

This court's recent decision in *Giglio* v. *Ardohain*, supra, 233 Conn. App. 743, informs this conclusion. In *Giglio*, the plaintiff brought a claim against the defendants sounding, inter alia, in private nuisance based on allegations that smoke from a woodstove on the defendants' abutting property, as well as noise created by various trucks and commercial activity, interfered with her ability to use and enjoy her property. Id., 745. At trial, the plaintiff testified that " 'significant amounts' of smoke *entered her home* as a result of the operation of the woodstove on the [defendant's] property, *causing 'physical harm,'* including respiratory issues that required medical treatment. The plaintiff testified that *she was forced to rent a motel room* at times to avoid the smoke. The plaintiff also testified that she has 'long-standing allergic asthma' and is highly allergic to dust, smoke, and mold. . . . In addition, the plaintiff testified as to the noise created by [the defendants'] vehicles and the alleged commercial activity taking place at the [defendants'] property. More than fifty exhibits were admitted into evidence, including medical records, photographs and video recordings of the smoke from the woodstove, and photographs and video recordings of [the defendant's] various vehicles. . . .

"In its memorandum of decision, the trial court concluded that the plaintiff had not sustained her burden to prove 'that [the defendants'] activities or conduct were unreasonable.' As to the private nuisance claim, the court found that any interference with the plaintiff's use and enjoyment of her property was such that it was not in

excess of 'what a normal person of ordinary habits and sensibilities' would have been able to endure." **(Emphasis added; footnote omitted.)** Id., 745–47.

In affirming the judgment of the trial court, this court concluded, inter alia, "that the trial court's finding that the plaintiff had not established her claim of private nuisance was not clearly erroneous. *The court considered all the relevant factors, including the nature of the interfering use as well as the use and enjoyment of her property that was being invaded.*" (Emphasis added.) Id., 753. Moreover, this court explained that, "[a]lthough the trial court did find that there was some interference with the plaintiff's use and enjoyment of her property, it did not find that interference to be substantial enough to warrant an award of damages. Put differently, the court concluded that the interference with the plaintiff's use and enjoyment of her property caused by the defendants' conduct was not unreasonable." Id., 755.

The evidence presented in relation to the defendants' nuisance claim in this case is far less robust than the evidence that was presented in relation to the plaintiff's *unsuccessful* nuisance claim in *Giglio*. In particular, there is no evidence regarding the defendants' use and enjoyment of their property vis-à-vis the level of "interference" the plaintiff's cameras caused therewith. The mere existence of cameras[30] directed at the defendants' property, which was the testimony of Daniel, is simply not enough to support a conclusion that, if the cameras actually "interfered" with the defendants' use and enjoyment of their property in some way, the interference was substantial and, thus, unreasonable. See, e.g., id., 751.

As explained in the Restatement (Second) of Torts: "Life in organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference, and these interferences

---

[30]As noted previously in this opinion, the plaintiff testified that she had taken one of the cameras down within weeks of its installation.

range from mere trifling annoyances to serious harms. It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together. The very existence of organized society depends upon the principle of 'give and take, live and let live,' and therefore the law of torts does not attempt to impose liability or shift the loss in every case in which one person's conduct has some detrimental effect on another. Liability for damages is imposed in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation." 4 Restatement (Second), Torts § 822, comment on clause (a), p. 112 (1979).

We conclude, based on the record in this case, that the trial court's conclusory finding that the plaintiff's placement of cameras directed onto the defendants' property constituted a nuisance is clearly erroneous and cannot be sustained. We further conclude that the court improperly rendered judgment in favor of the defendants on the defendants' nuisance claim set forth in the third count of their counterclaim. Consequently, the court improperly enjoined the plaintiff from directing her cameras at the defendants' property and from further deployment of her cameras and noisemakers.[31]

In summary, the trial court (1) properly found in favor of the plaintiff on the defendants' quiet title claim in the first count of their counterclaim; (2) improperly found in favor of the defendants as to the plaintiff's quiet title, injunctive relief and trespass claims in counts one, two and three, respectively, of her complaint; and (3) improperly found in favor of the defendants with respect to the trespass and nuisance claims set forth in the second and third counts, respectively, of their counterclaim.

---

[31] We note that, despite finding that the plaintiff's placement of cameras directed at the defendants' property constituted a nuisance, the trial court did not find whatever interference they may have caused to be substantial enough to warrant an award of damages. See *Giglio* v. *Ardohain*, supra, 233 Conn. App. 755.

The judgment is reversed only as to counts one, two and three of the plaintiff's complaint and counts two and three of the defendants' counterclaim and the case is remanded with direction to render judgment on those counts for the plaintiff and for a hearing with respect to the damages and injunctive relief claimed by the plaintiff; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.